OPINION OF THE COURT
Martin B. Stecher, J.
The defendants move to set aside a jury finding of liability and for judgment notwithstanding the verdict (CPLR 4404 [a]).
This was an action for a finder’s fee, the plaintiff alleging that pursuant to the terms of a written contract, it was entitled to compensation for bringing together defendant Harry S. Arpadi, the principal of several of the defendants, and Fred G. Sternau, the principal of the corporation which acquired the Arpadi stock interest in the Wellington companies. The defendants contended that the plaintiff did not find or present Sternau; and even if it did, that plaintiff violated its fiduciary duty by failing to reveal to the defendants material, adverse information known to the plaintiff’s principal, Kimball Dunton, which in good conscience he should have communicated to the defendants.
On July 26, 1988, after several months of conversation between Arpadi and Dunton, defendant Wellington Advertising entered into a finder’s agreement with the plaintiff. The agreement was signed by plaintiff’s then-president Mel Margulies. The agreement provided that the plaintiff would be entitled to "a Completion Fee when a Transaction is closed within three (3) years after the termination of this Agreement with a party introduced and/or presented by [plaintiff] to [Wellington Advertising Inc.].” A "completion fee” schedule was annexed.*
The jury was presented with three questions which it answered, in substance, as follows: The plaintiff introduced Sternau to Harry Arpadi; the plaintiff had "material adverse information” concerning Sternau which it failed to disclose to *391 Harry Arpadi; and that Arpadi prevented the plaintiff from disclosing the adverse information to him.
Three days after signing the finder’s agreement on behalf of the plaintiff, Margulies gave up his association with the plaintiff and joined a company known as Charles Street Securities. When Margulies joined Charles Street Securities the latter already had among its clients Sternau, who was seeking to acquire a small advertising company. Margulies acting on behalf of Charles Street Securities sought to create a merger between Arpadi’s companies and Sternau’s company or to help Sternau buy out Arpadi’s interest. It is clear that Margulies did not introduce Sternau and Arpadi to each other until some time in September, six weeks or two months after he left the plaintiff’s employ.
The plaintiff’s claim to a commission is based upon the testimony of its remaining principal, Kimball Dunton, who testified that on August 8, 1988, two weeks after the finder’s agreement was signed, he, Margulies and Arpadi met in the plaintiff’s office at which time Margulies said that he had two potential buyers for Arpadi’s business, identifying neither of them. During pretrial proceedings, Dunton asserted that the August 8 meeting was not with Arpadi but among himself, Margulies and Sternau and that he later introduced Sternau to Arpadi. It is quite clear that this was not the case. Arpadi denied that there ever was any such August 8 meeting. Sternau, without contradiction, testified he never met Dunton; but the jury was entitled to believe the version given by Dunton at the trial, namely, that he, Margulies and Arpadi discussed a transaction concerning Margulies’ anonymous clients on August 8.
Dunton never introduced Arpadi to Sternau; indeed, he was not aware until some time in the fall of 1988 that Sternau was the buyer; Dunton did not find Sternau for Arpadi; it was Margulies acting on behalf of Charles Street Securities who brought Sternau and Arpadi together. It is dubious that this scenario entitled the plaintiff to a commission (Portman Am. Corp. v Ratner, 57 AD2d 811 [1st Dept 1977]).
Nonetheless, the contract between the Arpadi and Sternau interests, prepared by Arpadi’s attorney, Greenapple, contained the usual "no-broker-but” clause which recognized both Charles Street Securities Inc. and the plaintiff as brokers or finders "which shall receive compensation pursuant to separate agreement”; and the day following the closing, Greenap *392 pie delivered to Dunton, Arpadi’s check for commissions in an amount pro rata to the cash paid the Arpadis the day of the closing. Clearly, the contract contained an admission against interest by all of the defendants and the check — ultimately stopped — was a further admission by Arpadi that a commission had been earned by the plaintiff (Ambrose Mar-Elia Co. v Dinstein, 151 AD2d 416).
The defendants’ posttrial motion, however, for judgment despite the jury’s verdict, was based on the jury’s answer to the second question, namely, that Dunton withheld from Arpadi material adverse information concerning Sternau. In portions of Dunton’s deposition of October 22, 1990, read to the jury, Dunton testified that at a prior time, when he was involved in some other transaction concerning Sternau, he was told by an investment banker that the latter had investigated Sternau’s "other transactions” and "that all followed the same general pattern * * * asset removal, borderline insolvency and minority investors holding the bag.” This is precisely what the defendants testified happened to them, to the extent of approximately $1 million.
On being asked during the deposition whether he ever provided this information to Arpadi he acknowledged that he had not because Arpadi, in or about October, had declined his offer to participate in the negotiations; and in November or December declined to discuss a "fee structure” for the plaintiff. This was the plaintiff’s only evidence of Arpadi’s acts which "prevented” Dunton from revealing the truth about Sternau and the only evidence on which the jury could have found that the defendant Wellington prevented the plaintiff from disclosing to the defendants "material adverse information concerning Sternau.”
Agents "are bound at all times to exercise the utmost good faith toward their principals” (Elco Shoe Mfrs. v Sisk, 260 NY 100, 103; to same effect see, Beatty v Guggenheim Exploration Co., 223 NY 294; Murray v Beard, 102 NY 505; Cristallina S. A. v Christie, Mattson & Woods Intl., 117 AD2d 284, 292), and if the broker is personally involved in the transaction without fully disclosing such conflicting interest to the client, the agent-broker is entitled to no commission whatever (TPL Assocs. v Helmsley-Spear, Inc., 146 AD2d 468); and the principal’s failure to make the inquiry which would have revealed the true state of facts "is immaterial, inasmuch as the principal is entitled to rely on the agent’s * * * complete, undivided loyalty” (TPL Assocs. v Helmsley-Spear, Inc., supra, at 471; *393 Wendt v Fischer, 243 NY 439). Any agent who proves disloyal to a principal "forfeits his right to compensation” (Lamdin v Broadway Surface Adv. Corp., 272 NY 133, 138).
Much of the case law involves the duties of brokers as agents. There is remarkably little reported case law on the fiduciary duty owed a client by a finder as distinguished from a broker. It has been said that "[i]f * * * there is any definite distinction between finders and brokers, it would probably be in the quantity of services rendered by each” (Minichiello v Royal Business Funds Corp., 18 NY2d 521, 527). Here, the plaintiff is a finder whose obligation of loyalty is not less than the obligation of a broker but may differ because of the nature of his employment as an agent. As it was said in Knauss v Gottfried Krueger Brewing Co. (142 NY 70, 75): "It is undeniable that where the broker or agent is invested with the least discretion, or where the party has the right to rely on the broker for the benefit of his skill or judgment, in any such case an employment of the broker by the other side in a similar capacity, or in one where by possibility his duty and his interest might clash, would avoid all his right to compensation. The whole matter depends upon the character of his employment. If A. is employed by B. to find him a purchaser for his house upon terms and conditions to be determined by B. when he meets the purchaser, I can see nothing improper or inconsistent with any duty he owes B. for A. to accept an employment from C. to find one who will sell his house to C. upon terms which they may agree upon when they meet. And there is no violation of duty in such case in agreeing for commissions from each party upon a bargain being struck, or in failing to notify each party of his employment by the other.” (Emphasis supplied.)
Our fact situation is, of course, different and raises this issue: May a finder present to his client as a prospective purchaser a person whom he knows to have a bad reputation for integrity in financial dealings, remain silent while the transaction goes forward and still receive his commission?
In my view, the finder is obligated to disclose to his client whatever adverse information he has concerning the buyer whom he finds. I do not suggest that the finder is obliged to investigate the prospect; only that he must reveal adverse information which a reasonable businessman would consider material in considering whether or how to engage in a major transaction with that person. It would be unconscionable and contrary to public policy if the courts were to allow *394 a finder’s fee to anyone who was thereby free to search out prospective buyers among known confidence men, swindlers and the like. Public policy requires at the very least that a finder reveal to his client such material adverse information as he has before he can claim any fee for bringing the parties together.
We turn then to the jury’s conclusion that Arpadi prevented Dunton from revealing the adverse information. This finding is utterly without support in the record. By no rational interpretation of any of the evidence can such a conclusion be reached. There was nothing to prevent Dunton, if he expected or intended to receive a fee, from picking up the telephone and conveying to Arpadi, who did not refuse to speak to him, that he had adverse information concerning Sternau; nor was there any reason he could not reveal such information by letter to Arpadi.
Whether Dunton was motivated to withhold the information because of pique at being excluded from the negotiation, or by greed for his and Margulies’ respective fees, is not significant. Dunton had a positive duty to reveal the information concerning Sternau, which as it turned out was predictive of what is alleged to have actually transpired; and having failed in this fiduciary duty, he is entitled to no fee whatever.
Plaintiffs separate cause of action against Arpadi on the stopped check was not presented to the jury because, in my view, the jury interrogatories would dispose of the issues relating to the check. Clearly, that cause of action cannot withstand scrutiny now.
The check (UCC 3-104 [1], [2] [b]), in the plaintiffs hands, was in the hands of a holder (UCC 3-301) but not a holder in due course (UCC 3-302 [2]). It was, therefore, "subject to * * * all defenses of any party which would be available in an action on a simple contract” (UCC 3-306 [b]), including, as in this case, breach of a fiduciary duty. Plaintiff’s contention that defendant’s defense to the check is a "mistake of law” which entitled plaintiff to judgment on the check is without merit. CPLR 3005 (and its predecessor Civ Prac Act § 112-f) hardly mandates such a result. While the court is vested with certain discretion concerning the viability of a mistake of law claim (Mercury Mach. Importing Corp. v City of New York, 3 NY2d 418; see, 3 Weinstein-Korn-Miller, NY Civ Prac ¶ 3005.01 et seq.), it should be abundantly clear that such discretion should not be exercised in plaintiffs favor here (see, Chase Natl. *395 Bank v Battat, 105 NYS2d 13 [Sup Ct, NY County 1951]), particularly where the Code (UCC 3-306 [b]) recognizes that an action on a stopped check bears the same burden, and is subject to the same defenses, as an action on the underlying transaction which gave rise to the check. The check therefore is not collectible because of the breach of fiduciary duty found by the jury.
The motion to set aside the jury’s verdict and for judgment in favor of the defendants is granted as to all causes of action not previously withdrawn or dismissed; and the clerk is directed to enter judgment dismissing the complaint.

 The calculation of the sums due under the jury’s verdict was left, by stipulation, to the court and if the plaintiff is entitled to prevail on the verdict, the judgment shall be as follows: In favor of the plaintiff against the defendant Wellington Advertising Inc. in the sum of $61,584.16. Such judgment should be entered jointly and severally with judgments against other defendants as follows: Against Harry S. Arpadi in the sum of $29,252.40; against Adele Arpadi in the sum of $25,926.93; and against Helfer-Broughton Inc. in the sum of $6,404.83; all with interest from January 20,1989, a reasonable intermediate date.